We'll call the matter of Daniel M. Saranchak v. Secretary,Pennsylvania Dept of Corrections. Mr. Lev. Good morning, your honors. May it please the court, my name is Stuart Lev. I'm here on behalf of Daniel Saranchak. As always, I thank the court for this opportunity to address you on the very important issues that are before the court today. And I would request two minutes for rebuttal time. I hope we can all agree at the start that by any reasonable standard, the performance of Mr. Saranchak's counsel at trial was pretty terrible. He didn't do any of the basic acts that we expect capital counsel to do. The earlier opinion of this court obviously speaks for itself in terms of counsel's performance at the guilt phase, notwithstanding the upholding of the degree of guilt determination that was made. That's right. And the same kind of, I think, easy analysis is equally applicable to the penalty phase. He just didn't do any of the investigation that both this court and the U.S. Supreme Court in a host of cases has told us has to be done. Were you going to structure your argument in terms of dealing first with the cumulative error issue and then move on to the death penalty phase? I'd be happy to do that. I mean, however you want to do it, Mr. Lev. I was going to start with penalty phase because I think it's a more straightforward issue, and I think cumulative prejudice gets into a more complicated analysis of this court's prior opinion. You've used the word straightforward, and I don't know how often in the context of AEDPA we can use the term straightforward, but perhaps you'd like to start there and tell us what our standard of review ought to be with respect to the penalty phase issue. Well, I think it's a twofold standard of review. The Pennsylvania Supreme Court's opinion on this case, which was the last reasoned opinion on the issue of ineffective assistance of counsel, found that counsel's performance was not deficient, so that finding gets reviewed for unreasonableness under 2254D. They didn't reach the question of prejudice, and so under Porter, the U.S. Supreme Court's decisions in Porter and Wiggins, you ought to address prejudice as the district court did below. Of course, the PCRA court did reach the issue of prejudice. The PCRA court did, and quite frankly, Judge Smith, I think this court's case law is a little bit confusing as to when you look through to the PCRA court's ruling and when you don't. In some cases, in Collins and Bond, we've looked through to the PCRA court's ruling. In Thomas and Simmons, we have not looked through to the PCRA court's ruling. In the end, I don't think it matters. Well, that's what I was going to get to, an additional step on that. Let's assume for purposes of argument that we looked at the PCRA court's analysis on this question. Would you be arguing then that its determination as to prejudice was contrary to a Supreme Court opinion or that it was an unreasonable application of a Supreme Court decision? I would argue both. I think it was contrary to Strickland, and as Strickland has been explained in Williams and Wiggins and the other Supreme Court cases because it didn't give sufficient credit and take into sufficient account the enormous amount of mitigation that we presented at the PCRA. But at the very least, it's a very fuzzy line to me between contrary to and unreasonable application of. At the very least, I do think it's an unreasonable application of those cases. Let me talk for a minute about the mitigation evidence that was presented at trial and then the mitigation evidence that we presented at PCRA. At trial, counsel put forth a superficial and cursory presentation. He put on a couple of witnesses to talk about Mr. Sarancek's level of intoxication. Forty pages' worth of transcript was it? Yes. And that included some cross-examination by the comment? That included some cross-examination. And that included the testimony of Dr. Krzyzewski, who couldn't even testify about Mr. Sarancek's history and Mr. Sarancek's state of mind because he hadn't evaluated him for the purposes of either guilt or penalty phase. All right. So let's go to the testimony that you presented at the PCRA proceeding because that's really the issue here, I think. Thank you, Judge Manasky. So the testimony that we presented tells a story of Sarancek's life that has a consistency and residency to it that not only is mitigating by itself, but it helps explain the circumstances that led to the killing. And I think that makes that even more powerful. Mr. Sarancek was born into a family where the father was alcoholic and very abusive, abusive of his wife and abusive of Daniel as a baby. That was the first two years of his life. Was there testimony that Mr. Sarancek's father was abusive of him or was there only evidence abusive of the mother? In the records, in the hospital records that were introduced as evidence at the PCRA hearing, there's descriptions of abuse of him. But either way, I think, for a child of that age, we know that psychologically abuse happens. Even beyond that, what we know is that Daniel was a very disturbed child. We know that from the school records, from the affidavits of his teachers that we introduced at the PCRA. And those school records never got into the record of trial at the penalty. Defense counsel never got them. Right. He didn't have them, let alone try to put them in. Daniel was diagnosed with atypical pervasive developmental disorder, which is a very serious childhood diagnosis that impacts functioning and social relationships and often leads to adult problems. He was placed in a special program for socially and emotionally disturbed children. His teachers described him as a very disturbed young man with a lot of problems, had very difficult functioning in both learning and social settings. Unfortunately, Daniel began to self-medicate himself as a young teenager by turning to alcohol and became an alcoholic and a substance abuser at a very young age. Only alcohol didn't help control his mental illness. It only made it worse. And the more he drank, the more addicted he became to alcohol, the worse his mental health problems became and led ultimately to two psychiatric hospitalizations. Mr. Love, let me interrupt you right here for a point that I know is very clear in the papers, but it might be helpful for argument and a number of purposes here. Since we're talking about the Pennsylvania death penalty statute and the penalty phase, which requires that the Commonwealth demonstrate certain aggravating circumstances and affords the defense an opportunity to offer certain mitigating circumstances, there were two aggravating circumstances pursued and met by the Commonwealth at trial. Can you indicate what the court instructed the jury on in terms of mitigating circumstances and perhaps relate the evidence to those mitigating circumstances? Sure, I'd be happy to. The court instructed the jury on the E3 mitigating circumstance, which is substantial impairment in your capacity to know what you're doing is wrong and to control your behavior, and the E8 mitigator, which is any other information about the character of the defendant or the offense. The court did not instruct the jury on the E2 mitigator of extreme mental or emotional distress, finding that there was an absence of evidence of that mitigator. And the jury found that there was no mitigation, and I think that's a very important part of this court's prejudice analysis and the reasonableness of the state court's ruling. The aggravating circumstances must outweigh the mitigating circumstances. The jury came in finding no mitigating circumstances. Right, and when the jury doesn't find any mitigation, death is mandatory. There's no deliberation about whether they think the defendant should live or die, and there's no opportunity for the jury to exercise its ability to exercise mercy or leniency, because under Pennsylvania law, mercy or leniency can only be considered through the finding of a mitigating circumstance. And I'm not suggesting that it's necessarily easy to demonstrate mitigating circumstances, but so it's clear, the defense need not prove a mitigating circumstance unanimously. Correct. For the jury. Correct. Only each individual juror gets to decide mitigation for themselves, and defense only has to prove it by a preponderance of the evidence, as opposed to the reasonable doubt standard. So Judge Lansky's question focused on the PCRA hearing, and Dr. Krzyzewski testified ultimately at the PCRA hearing. How was his testimony different at the PCRA hearing from what we have earlier in the record? Enormously difficult. Early in the record, Dr. Krzyzewski could only testify that alcohol generally disinhibits, has a disinhibiting effect upon people, and might lead people to do things they wouldn't ordinarily do. He couldn't testify to anything about Mr. Sarancek's background or his psychiatric history or how that might have affected him at the time of the offense. At PCRA, he testified. Or was it necessary to relate how it might have affected him at the time of the offense? Not necessary. Right. Not necessary. The Constitution is very clear, the U.S. is very clear, that mitigation does not have to relate to the time of offense. But when it does, it becomes that much more powerful. And I think, Judge Smith, in your opinion, in the Thomas case, you noted that the mental health testimony there was really the thread that tied together all of Thomas' background and led to some understanding of the horrific nature of his actions. And I think we have the same thing here, that the mental health testimony in history ties everything together. Because what we have here is a consistency that we don't often see in a lot of death penalty cases. There's a consistency from his behavior, from his psychiatric hospitalizations, from the diagnoses of the doctors when he was hospitalized. He was diagnosed with bipolar affect, with depressive disorder, with major depression issues, with alcohol abuse. All that is well documented and exists in the record. There's no inconsistency between what we know before the crime and the testimony that Dr. Krzyzewski and Dr. Kropp gave after the crime. It's a continuous pattern. And it wasn't refuted. The Commonwealth didn't introduce any evidence to refute it. They didn't contradict it. It's all there in the records and well accepted. And so to go back to your point, Judge Smith, Dr. Krzyzewski's testimony ties together that history to opine on his state of mind at the time of the offense. And that was history Krzyzewski did not have available to him when he made the initial competency determination pursuant to the trial court's order before the trial. That's correct. And Dr. Krzyzewski also testified that had he been asked to do a diminished capacity or a mitigation evaluation, that it would have been a very different kind of evaluation than the evaluation he did for competency. And Attorney Watkins asked for more than he got. Did he not in that order? He did. He initially did. He just didn't pursue it when Judge Goldman, I believe it was, issued an order that simply went to trial competency and his ability to assist counsel. That's right. And he didn't do that. If he had done the investigation, he could have gone to Judge Goldman and said, look, I have these school records. Look, I have these hospital records. I have these prior mental health records that show that this is a very troubled man. That's why I need a doctor to help evaluate and to help prepare for guilt. Would a competent attorney know these records existed if the family didn't tell him about them? Well, first of all, the U.S. Supreme Court has made clear in Porter and in Wiggins, this court said in Bond, that the attorney can't pass off his investigative duties because of what the family tells him. Well, sure. But what did he know from that report that Kruschevsky did do? He knew from Dr. Kruschevsky's report, from Cerencic's own self-report, that he had been hospitalized for psychiatric evaluations in the past and that he had a suicide attempt in the past. So those red flags were there. It was easy to learn that Daniel went to school. You know, he lived in Pottsville all of his life, so getting his school records was not difficult. He was on probation at the time of this event. The probation officer was across the street from the courthouse. Watkins never went and talked to the probation officer to see what kind of person Daniel was and what his history. We introduced at the PCRA an affidavit from the probation officer who said that he was aware of Daniel's long history of mental health problems and that Daniel was a good probationer, that he worked very hard, that he was cooperative, that he had this long history of mental health problems. So finding this information was easy. I'm sorry, this is a question. Does the moratorium, the governor's moratorium on executions, affect the rightness of deciding this penalty phase question? You know, I have a hard, I don't know the answer to that question, quite frankly, and I think that's a question for this court and its discretion. I know that in a couple of cases where there are only penalty phase issues that are an issue, this court has placed those cases in suspense. I think that's Duffy and Fahey. Right, I'm aware of that. I know in other cases where there are just guilt phase issues before the court, the court has indicated to the Commonwealth that without the filing of a motion, they're not going to place the case in suspense. This case falls in between. We have a guilt phase issue and we have a penalty phase issue. I haven't seen this court address that situation before. So I think that really is in the discretion of the court. If you think it serves the interests of justice to put the penalty phase on hold and just address the guilt phase, that's fine. If you think it serves the interests of justice to reach the penalty phase so that we eliminate some delay should the moratorium be removed or whatever happens with the moratorium, that's okay. I'm just wondering with the moratorium in effect, let's say we were to find that there was an entitlement to relief on the penalty phase only of the matter, it would be going back to the state court for a new trial on the penalty phase. I certainly think at that point, Judge Vinasky, that it could be up to the state court and in the discretion of the state court as to whether or not when they want to proceed with any proceedings or what will happen or whether the district attorney would even move forward on another resensing hearing in light of the moratorium and the other events. All right. Thank you. With time waning, do you want to continue on the penalty phase, Mr. Lever, or do you want to go to cumulative error? I could continue for quite a while on the penalty phase. Well, I believe that, but it's not what I asked. I know. Does the court have any other questions on the penalty phase? I do not. So let me just end the penalty phase by saying this case is no different than Williams and Wiggins and Rompilla and Porter from the Supreme Court, from Bond and Alton and Blystone and Germain from this court. The Commonwealth hasn't made any effort to distinguish those cases, hasn't addressed those cases, and I think penalty phase is relatively straightforward. Cumulative prejudice is more complicated. It's more complicated because we need to deal with, I need to deal with this court's prior opinion and prior finding that the errors individually were not prejudicial because there was such ample evidence of Mr. Saranchek's specific intent. And so let me start there with the guilt phase issues. I think there are three or four reasons. Could we actually start with what standard of review we need to apply with respect to the cumulative errors? I think it's a de novo standard of review. The Pennsylvania Supreme Court in its review of cumulative errors said, under our law where there are no errors. So it's merely a question of the fact that the Supreme Court of Pennsylvania used state law to make this determination as opposed to federal? No, I think that they really didn't recognize a cumulative error issue because they didn't recognize that there were any errors or any defects in counsel's performance and so they had nothing to accumulate. Are you saying that the Pennsylvania Supreme Court did not explicitly reject the cumulative error? They did, but in their own way. It was Pennsylvania law at the time. Well, that's what I asked you a moment ago. Well, then maybe I didn't answer as clearly. It was Pennsylvania law at that time. And in the case they cite, Rollins says, no amount of error can accumulate to be cumulative error. They've since reneged on that position and have accepted the cumulative error thing. But in this case at this time, they didn't. So yes, I would say that they didn't really address the merits. It's not an adjudication on the merits so that we should get de novo review. But even if we apply 2254D, it's unreasonable not to consider the impact. It's unreasonable under Strickland that requires that all of the errors of counsel be considered to determine prejudice. It's unreasonable under Taylor and the other Supreme Court cases we cite in our brief not to accumulate. So, again, I think it's de novo review, but I don't think the standard of review is going to be determinative of this issue. Is a cumulative error claim clearly established by Pennsylvania, I'm sorry, by Supreme Court precedent for ADPA purposes? I believe that it is. I think it's Taylor v. Kentucky that we cite in our brief that recognizes that puts together different errors to determine a question of prejudice. There's another case whose name I'm blanking on, but it's in our brief. And I certainly think in terms of ineffective assistance of counsel, Strickland is very clear that you have to accumulate counsel's errors. Strickland, as we wrote in the brief, Strickland speaks over and over again to looking at whether the errors in the plural committed by counsel created a reasonable probability of a different result. So I think it is clearly established. And we know that counsel here committed some errors. We know that his investigation was highly deficient. We found deficient performance the last time. We also know that he didn't understand the law about when he could file a motion to suppress. He was under the belief, and he advised Mr. Saran to check the brief. What was the impact of that, however, for any prejudice here, the fact that he didn't know that? Well, some. Some. I think this Court the last time said that Mr. Sarancic's statement to the police was evidence of a deliberate and premeditated shooting. And in conjunction with some of the other evidence, it weighed in it. So it certainly had some weight. But now we still have to consider that weight combined with the weight of the other evidence, both that presented at trial, the evidence of his intoxication and strange behavior that was presented at trial, and the limited psychiatric evidence. Of course, this Court the last time found that only some of the psychiatric evidence that we presented at PCRA was relevant to the diminished capacity defense. And so that. We now have a different combination and balance that has to be weighed against the other facts. So let me explain, if I have the time, the few reasons why I think that the question now before you ought to be answered differently than before. And it's really somewhat of a different question. It is a different question. Yes, I agree. Because there's more factors involved. The first point I want to make is that the last time, this Court placed great reliance on the testimony from Roy Miles, the co-defendant turned witness for the prosecution in this case. And I think there are a number of reasons why weight should not be put on Miles' testimony. At least great weight shouldn't be put on it. Miles is important in this case, because he's the only witness who establishes the idea that this was a planned robbery and shooting. He's the only witness who testifies to statements Saranchek allegedly made to him about going to get money and maybe having to kill somebody. He's the only witness to the events that occurred in the house. He's the only witness to the testimony that Saranchek was making to Miles. There's certainly circumstantial evidence, however, of planning here, at the very least, circumstantial. The obtaining of the gun, the girlfriend's season with the gun, this is well before the shootings take place. Yes, yes. But whether that was planning, at the time he got the gun, he told his girlfriend and his brother that he wanted to go hunting. Well, he's not going to say, I'm going to go shoot my uncle. I'm sorry? He's not going to say, I'm going to go shoot my uncle. No, he's not. But he invited his brother along to go hunting. And I don't know that if he was planning on going to shoot his uncle, he would have invited his brother along. And his brother declined. This was testimony at the PCRA hearing as well. His brother declined to go along because Daniel was so drunk he didn't want anything to do with him at the time. So some evidence of planning, certainly, and certainly sufficient evidence. I'm not arguing that the evidence is insufficient or that a jury couldn't convict. I can't argue that. There's certainly that. But what the prosecution has to show is they have to show a deliberate, willful, and premeditated intent to kill beyond a reasonable doubt. And under Pennsylvania law, a shot to a vital portion of the body is evidence of intent? Yes. It's evidence which the jury may or may not accept. The jury may consider as part of whether or not the Commonwealth met its burden. But in and of itself, it doesn't mean that a jury would find, necessarily, that the Commonwealth met its burden to prove that kind of deliberate and premeditated intent, or as other Pennsylvania courts have called it, a conscious decision, a conscious and fully aware decision to kill. It doesn't mean they will. And in our reply brief, in a footnote, I think footnote five of our reply brief, we cite a smattering of Pennsylvania cases in which juries or judges came back with third-degree murder verdicts in situations where there was obvious evidence of planning and intent. Mr. Love, I have two more minutes. Let's wrap up the cumulative argument, and then you, of course, have rebuttal. So Miles' testimony, he takes the Fifth Amendment during the course of his testimony about issues relating to where he got the money, which go directly to whether or not there was a robbery that occurred and who did it. Miles' testimony is not corroborated. His testimony about a robbery is not corroborated. There are no proceeds ever found. There's no evidence that at the scene of a search for money, it's all, there's no evidence that the safe was tried to be open. It's all just Miles' word. So there's no corroboration. Miles lied. He told the story about Saranchak taking the wallet that we know is not true because the police officer at the preliminary hearing testified that the wallet was there on a shelf with the uncle's personal effects. And Miles had a motive to lie and to protect himself and to accede to the prosecution because he got an enormously good deal. And there's a different standard, as you said, Judge Smith, that we apply now. In cumulative prejudice, we're looking at a breadth, substantial, and injurious result. And we have to bear in mind that all that defense has to show is a reasonable probability of creating a reasonable doubt about specific intent. Right? That's different in a diminished capacity where a defendant has to show that his faculties were so overwhelmed as to not know what he's doing. A reasonable doubt. Strickland makes that clear. Hinton makes that clear. And if there's a reasonable probability of a reasonable doubt about intent, then Mr. Saranchak deserves to have a competent lawyer present all of the evidence that could support his claim that there was no intent to kill necessary for first-degree murder and have a judge or a jury decide that question with full knowledge of all of the facts and circumstances of the case. And that's what I'd ask this court to do. Thank you very much, Mr. Leff. We'll have you back on rebuttal. Thank you very much, Your Honor. Ms. Peterson. Ms. Peterson, could you begin by responding on a threshold way to the question that Judge Manaske has asked with respect to the governor's moratorium and whether or not this court should or is in a position to move forward on this case? Yes, Your Honor. You are with the Attorney General's Office. Correct, Your Honor. And the Attorney General has recently challenged with the Supreme Court of Pennsylvania that moratorium. That's correct. It's the position of the Commonwealth of Pennsylvania, as evidenced through the brief that the Attorney General's Office filed with the Pennsylvania Supreme Court in the Hubert Michael case, as well as the brief that was filed by the Philadelphia District Attorney's Office in the Terrence Williams case, that the moratorium is in fact unconstitutional. We plan to show through our briefs an argument that the governor has overstepped his authority, that the only way that the capital punishment system in Pennsylvania can be abolished is through the legislature, not by an edict from the governor that he's going to reprieve these executions unless and until he is satisfied that the execution process in Pennsylvania is, in his words, infallible. So you do not see an obstacle then to this court hearing and deciding this matter? No, Your Honor. Thank you. And with the Court's permission, I'd like to address Mr. Love's arguments, beginning with his challenge to the sentencing phase portion of the trial. Mr. Love indicated during his argument that the mitigation evidence that was presented at the Post-Conviction Relief Act hearing told the story of Mr. Saranchak's life.  I believe he also stated that Dr. Krzyzewski's testimony regarding mental health history and his testimony tied everything together. And the Commonwealth respectfully disagrees with those assertions. The defendant explained why he committed the murders. He told that to a children and youth worker. He said that he killed his uncle because of his uncle's greed, his uncle had, quote, married a whore, quote, and that the inheritance money went to their children rather than to Mr. Saranchak and his siblings. So he espoused that reason for killing his uncle to the children and youth worker. He also told that same children and youth worker that he killed his grandmother because she was ill. So to the extent that this mitigation evidence was offered to show why he acted the way he did when this crime was committed, which Mr. Love said is important when you can tie those two things together, just doesn't add up in this case. This is not a situation. But you don't need to tie those things together. Correct. Correct, Your Honor. And the jury, when they were looking at this evidence, I mean, they also were faced with the fact that although the defendant did suffer from alcoholism, and that was presented to the jury, they did learn that he acted differently when he was under the influence of alcohol, that he would act like he was in the military, and that he would become out of character. They heard all that. All right. I'm sorry. Go ahead. They heard all that. The way you closed obviated the need for my question. Thank you, Your Honor. They heard that evidence. But this was not a situation where the defendant wasn't in control of his faculties. This is a very planned, methodical. This, to me, is going to the specific intent question, as opposed to the issue of mitigation for purposes of whether the death penalty should be imposed. Well, in terms of the mitigation evidence, Your Honor, I know Mr. Lev focused on the defendant's troubled childhood, the fact that he had a problem with alcoholism, that he had some developmental disorders in his childhood. None of which went into the trial record of the guilty. Not to the extent that was presented at the PCRA hearing, correct? No, no. There were no school records that went into the record at trial in the penalty phase. Isn't that correct? That's correct, Your Honor. But it's the Commonwealth's position that that would not have made a difference. Well, I understand that. And perhaps we should get this clear at the outset. Is the Commonwealth conceding that trial counsel's performance was unreasonable? Yes. All right. I thought that was the case, but I didn't see it explicitly stated toward the end of your brief.  That is correct, Your Honor. All right. Yes, but if we look at everything that was adduced at the PCRA hearing and weigh that with what was presented, the Commonwealth's position is it still would not have made a difference. This is not a situation where, while the defendant may have experienced some troubles in his childhood, this court has certainly seen more extreme circumstances, such as children that suffer from horrific abuse, cannot finish school. From all accounts, even his probation officer, other than when he was drinking, the defendant was, in general terms, a good person. He was of good character. It was when he was consuming alcohol that he would become something different. He was consuming alcohol on the night of the murder. Correct. Ms. Peterson, in terms of what this court has seen, and I referenced this in an early question to Mr. Webb, speaking for myself, I'm an old Pennsylvania trial judge and an old Pennsylvania DA, emphasis on old, and I can tell you this, I don't remember seeing such a short transcript, 40 pages, covering the total case for mitigation in the penalty phase. And I tried first-degree murder cases in the state system many years ago. And, Your Honor, that's why the Commonwealth does concede that counsel's performance was deficient. But given that, how can we regard the Commonwealth's statement that no jury would give much weight to emotional and mental problems when the defendant has entered the house of a 78-year-old uncle and 87-year-old grandmother and shot them both in the forehead to obtain money? That's page 29, and that's essentially your entire argument for why we should reject the argument of Mr. Webb. That certainly reads to me as nothing but a very, very short ipsedixit on what a jury otherwise would have done. But please give me more reasons for why we should believe that contention in your brief, or in the Commonwealth's brief. Well, I think, Your Honor, in addition to the lack of information that was before the jury, I think you also have to consider the power and the weight of the positive things that were presented to the jury on his behalf. They emphasized the fact that he admitted responsibility for his actions, that he was remorseful, that he was of good character. They brought in people from the prison to testify to his cooperative nature. There was cooperation with respect to this prosecution. Don't you concede that based on what Dr. Krzyzewski testified to at the PCR hearing, there could have been substantial development of a mitigation case based upon what Mr. Soranchak was when he was not drinking? It seems to me that the one point made, and it was made by his girlfriend, I believe, in the penalty phase, was that he was a good guy, so to speak, when he wasn't drinking. That's not exactly a lengthy explication of Mr. Soranchak, which humanizes him to the jury for purposes of mitigation, is it? I mean, that's one statement. Was there more? Was there more than that in terms of what and who Mr. Soranchak was when he was not intoxicated? I believe, in addition to his wife or his girlfriend, I believe that there may have been, and obviously the record would speak for itself, I believe that there were neighbors or friends that also testified dissimilar. Well, I think there were five witnesses, and as I've said twice already, it covered a total of 40 pages in the transcript, which included Commonwealth cross-examination. Yes, Your Honor. Again, Your Honor, it's the Commonwealth's position that even if they had heard about the troubles that he encountered in his childhood, had heard this testimony, this new opinion from Dr. Kruschevsky that still would not have changed the outcome of the case, at best it would have supported the catch-all mitigator and not the E3 mitigator that Mr. Lev spoke of earlier. Why should we conclude that? Because I don't believe it was his opinion that his opinion... What's the language of the statute? Extreme? I have it somewhere. I do too. The E3 aggravator, I don't have it in front of me, Your Honor, but it's to substantially conform your conduct to the requirements of the law. Now, that was not the mitigator I was referring to, but go ahead. And the E2 mitigator would be this extreme emotional disturbance, correct? So you don't think that Dr. Kruschevsky could have established that arguably for purposes of that mitigator being given to the jury? Correct, and this Court has already reviewed the issue of whether the jury should have been instructed on that particular mitigator, and this Court concluded that that instruction was not warranted, given the evidence that was presented, and I submit that given... Well, if it's not warranted in view of the evidence that was given, does that mean it was not warranted in view of the evidence that should have been given? That's the common law's position, Judge Roth. I mean, the facts of this case illustrate that the defendant did know what he was doing here. This wasn't an extreme emotional disturbance or mental disturbance where he had some type of a break from reality, didn't remember, heard voices telling him to do this. He methodically planned this, executed it, carried it out, and then after the murders took place, he went on with his ordinary activities. He went back to the bar drinking. He went to a diner later on and had something to eat. Certainly those actions are not consistent with someone acting under extreme emotional and mental distress. Let's assume that's correct. What was in the record to support the E-8 mitigator? I believe that that argument was based upon the testimony from the family, just the lay witnesses. I believe that Dr. Krzyzewski's opinion at trial was more general as to the effects of alcohol. I don't believe he – Well, it wasn't specifically how Mr. Suranshak reacted to alcohol, which he did testify at the PCRA hearing. Correct. Because he was able to consider how to apply it personally as opposed to how to apply it in general. Doesn't that make a big difference? Again, Your Honor, at the end of the analysis, when looking at all of the mitigation that could have gone in and weighing that with what was presented, as well as the aggravating factors that were presented at the jury, we did not believe the Commonwealth's position is that it would not have made a difference in the outcome here. With respect to the cumulative error argument, there were two issues with respect to counsel's deficient performance that were identified previously. One had to deal with the failure to conduct an adequate investigation into the diminished capacity defense. And the second had to deal with counsel's deficient performance in failing to litigate the suppression issue. And now taking those two together, Mr. Suranshak is seeking relief under cumulative prejudice theory. With respect to the diminished capacity defense, as this Court has seized upon this language before its opinion, the defendant was a very troubled man who carried with him baggage of a troubled past. Just because he had a troubled past is not enough to establish that he was losing his faculties and sensibilities, that he was unable to form the intent to kill. I think all of the facts speak to the opposite, that he was obviously able to form the intent to kill in this case. The facts, I think, are dispositive of this particular claim. All of his actions, his words, his confessions, both to police and to the children and youth worker, indicate a very premeditated planned case of murder. So while counsel may have been deficient in terms of his presentation of the diminished capacity because he did not present an expert, as this Court has already looked, the testimony that was presented at the PCRA hearing, both from Dr. Kruszewski and from Dr. Croft, were not relevant to the issue of diminished capacity. The only thing that this Court found that was arguably relevant was Dr. Kruszewski's opinion that the defendant becomes depressed or he is depressed when he is drinking, but that's it. So certainly with respect to the first instance of deficient performance of counsel, we would argue that that certainly did not undermine the fundamental fairness of the trial when you consider it with the second suppression issue. The second suppression issue has to deal with his statements to the police. This Court has already determined that he most likely did invoke his right to remain silent when he informed the police that the information was classified. And after telling them that it was classified, he was on a special mission, he did make some admissions to killing his uncle. However, even setting that to the side, even if that had not come in, if counsel had litigated that and the trial court did not hear that for purposes of the degree of guilt, the trial court heard it from the children and youth worker. In fact, the children and youth worker provided much more information and context regarding the defendant's involvement and his intent than the police did. She provided an explanation as to why he killed his uncle, why he killed his grandmother. He took her through the chain of events, even acknowledging to her that he took time to stop and pet the dog after the murders because he was concerned with how the dog would react with dead people in the house. So certainly she had a plethora of information regarding the defendant's inculpatory statements that the court would have considered, even if it had not heard the testimony from the officers. And finally, counsel had referenced the testimony of Roy Miles. And I would note that they did request to expand the certificate of appealability with respect to the issue of whether Mr. Saranchak's Fifth and Sixth Amendment rights were violated when Roy Miles invoked his Fifth Amendment right at trial and refused to answer questions. This court denied that request. In the appellant's brief, they noted that it was unclear whether this court would be willing to consider that argument for terms of the cumulative prejudice analysis. It's the Commonwealth's position that the issue with Roy Miles is not properly before the court. It should not be considered for purposes of the cumulative prejudice because there was no finding that there was deficient performance. There was no finding by any court of that. Therefore, it should not be factored into the overall analysis. And with respect to counsel's request that this court look at the credibility of Mr. Miles, what he stood to gain, they emphasized the fact that he was an important witness. Again, the defendant was convicted of murder, burglary, robbery, and conspiracy. The trial court obviously credited the testimony of Mr. Miles, who provided information regarding the fact that they took money while they were at the house committing the murders, and the credibility determinations of the state court should stand. They're entitled to deference and cannot be looked at anew for purposes of this court's analysis. Can I take you back to the penalty phase of the case and ask what is the Commonwealth's position with respect to our standard of review on the prejudice issue? The Commonwealth, I know that opposing counsel indicated that there was some conflict in this court's case law. However, we certainly recognize that this court has looked to the trial court's prejudice analysis, and we certainly defer to the court on this case. And you believe we should give deference then to the trial court's determination on that particular matter? Yes, Your Honor. Jane, do we have anything else? There are no further questions. Thank you, Ms. Peterson. Thank you, Your Honors. Mr. Lev, you have rebuttal. Let me try to just make a few quick points here. I don't think I need a lot of time. One is the standard of prejudice at penalty is not a difficult standard. It's a reasonable probability standard, and under Pennsylvania law we only have to show that there's a chance that one juror might have found mitigation and weighed it in favor of a life sentence. Because under Pennsylvania law, a finding of death has to be unanimous if even one juror votes for life, it's life. So that's the standard of prejudice. And for all the reasons we've already discussed, I think we meet that. In looking at that standard, you have to look. The Supreme Court tells us that what you have to do is take the evidence that was introduced at trial, scant as it was, and add it to all the evidence that was introduced in the penalty phase, all the evidence that was introduced at PCRA, and then weigh that against the aggravating circumstances. And although the aggravating circumstances here are serious, there's a bizarreness to this crime. Saranchek loved his grandmother. He doesn't have any prior history of violence. This was a somewhat aberrational act. There was a suggestion, I believe, or actually a brief history of some spousal assaultive behavior, but that was the only thing in his history that was violent. That was the only thing, and I don't think that ever led to any criminal prosecutions. It might have led to protection from abuse order. But certainly compared to other cases and other defendants this court has seen, like the Bond case where Bond went on a crime spree and killed two different people in Chinese restaurants and shot and injured others and had a history of violence, this case is very different. And so the standard of prejudice properly applied is not a difficult one to make. As to the Roy Miles issue, we briefed it because we found that we were not quite clear as to this court's order. Certainly this court denied COA on Miles' standalone issue, but he had been included in our request for COA on the cumulative prejudice issue that was granted it. So we briefed it out of caution, and because we thought it was something the court should hear and consider. But I understand that this court might view its COA order somewhat differently than we did. Finally, with respect to Lori Gerber, the child social services worker, she did not testify that this was a planned murder or that Saranchek admitted that this was a planned and premeditated murder. She said that Saranchek told her that he snapped and then that things went awry. And in talking about how he felt about his grandmother and how he felt about his uncle, he did not assess that as that was the motive for me killing them. He merely told her in discussion several weeks after the crime to a woman who he needed to have on his side so he could have communications with his children to explain his relationship to his grandmother and his uncle. So I don't think it carries, certainly it carries some weight, I can't deny that. I don't think it carries the weight that the prosecution tries to give to it now. Thank you very much, Your Honor. Thank you very much, Mr. Lev and Ms. Peterson, for your very helpful arguments in this very difficult case which we will take under advisement. Thank you again. I ask the court to close the proceedings.